Approved: _____
MICHAEL K. KROUSE
Assistant United States Attorney

Before: THE HONORABLE ANDREW J. PECK
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

- v. -

MIGUEL THOMPSON,

Defendant.

- - - - - - - - - - - - - - - - - - x

SEALED COMPLAINT

Violation of 18 U.S.C.
§§ 922(g)(1) and 2

COUNTY OF OFFENSE:
NEW YORK

17 MAG 2819

SOUTHERN DISTRICT OF NEW YORK, ss.:

ANTOINETTE GUZMAN, being duly sworn, deposes and says that she is a Criminal Investigator with the United States Attorney's Office for the Southern District of New York, and charges as follows:

COUNT ONE
(Felon in Possession)

1. In or about June 2016, in the Southern District of New York and elsewhere, MIGUEL THOMPSON, the defendant, after having been convicted in a court of a crime punishable by imprisonment for a term exceeding one year, knowingly did possess in and affecting commerce a firearm, to wit, a defaced .380 caliber, Cobra Enterprises, model FS-380 semi-automatic pistol, which had previously been shipped and transported in interstate and foreign commerce.

(Title 18, United States Code, Sections 922(g)(1) and 2.)

The bases for my knowledge and for the foregoing charge are, in part, as follows:

2. I am a Criminal Investigator with the United States Attorney's Office for the Southern District of New York. I have been personally involved in the investigation of this

matter. This affidavit is based upon my personal participation in the investigation of this matter, my conversations with law enforcement agents, witnesses and others, as well as my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

3. Based on my review of records and recordings from the New York City Police Department ("NYPD"), I have learned, among other things, the following:

a. On or about June 19, 2016, at approximately 8:12 a.m., a person who wished to remain anonymous (the "911 Caller") called 911 (the "911 Call"). The 911 Caller stated, in substance and in part, that, approximately one hour earlier, he saw a 6-foot-2-inch-tall black man place a gun under a car. The 911 Caller described the car as a Jaguar (the "Car") parked on 150th Street and Bradhurst Avenue in Manhattan, New York (the "Location"), and he provided a valid New York State license plate number. The 911 Call lasted approximately four minutes and 20 seconds.

b. NYPD officers responded to the Location and found the Car. One of the officers discovered, attached to the Car's muffler, a small paper bag wrapped in black tape. The bag contained a defaced .380 caliber, Cobra Enterprises, model FS-380 semi-automatic pistol, which was loaded with seven rounds (the "Gun").

c. The Car belongs to an African-American male who is approximately 6 feet 2 inches tall ("Individual-1"). Individual-1 resides in the building across the street from the Location. Individual-1 is a convicted felon who is presently serving a federal term of supervised release in this District.

d. On or about August 22, 2016, the Office of the Chief Medical Examiner for the City of New York ("OCME") confirmed that human DNA sufficient and suitable for comparison was detected on swabs of the Gun.

4. On or about September 28, 2016, pursuant to a court order, I obtained a DNA sample from Individual-1. On October 28, 2016, OCME concluded that Individual-1 is excluded as a contributor to the DNA sample that was detected on swabs of the Gun.

5. When I obtained Individual-1's DNA sample, Individual-1 stated, in substance and in part, that he suspected that the ex-boyfriend of a woman with whom Individual-1 was involved in a relationship planted the Gun under the Car.

   a. According to Individual-1, this other person has made other false accusations against Individual-1, including calling 911 in or about August 2016 in order to accuse Individual-1 of harassment.

   b. Based upon my review of NYPD records, I have learned that, on or about August 17, 2016, a 911 Call was placed ("911 Call-2"), in which a man who identified himself as "Miguel Thompson" stated that Individual-1 threatened him in Court and was following him in a car. The NYPD later arrested MIGUEL THOMPSON, the defendant, on charges of making a false report after NYPD officers determined that the 911 Call-2 constituted a false claim against Individual-1.

   c. Based on my review of cellular phone records, I have learned that the 911 Call-2 was made from a phone number registered to THOMPSON (the "Thompson Number").

6. Based on my review of NYPD and cellular phone records, I have learned about three other phone numbers, as follows:

   a. The 911 Call was placed from a cellular phone number (the "911 Call Number") registered to a woman who resides in an apartment building located in the vicinity of 140th Street and Seventh Avenue in Manhattan, New York ("Individual-2"). Based on my review of law enforcement databases, as well as my review of insurance claims that the 911 Caller has filed, I have learned that the 911 Caller lives with Individual-2.

   b. Individual-2 filed a report with the NYPD in or about February 2017 in which she listed another phone number. Based on my training and experience, individuals who live together often share phones. The 911 Caller therefore appears to have had the ability to make phone calls from both the 911 Call Number and this other phone number (the "911 Caller's Other Number").

   c. Another individual ("CC-1") used the cellular phone number 347-691-1404 (the "CC-1 Number") at around the time the Gun was recovered. An NYPD complaint against CC-1 states, in substance and in part, that, on or about June 29,

3

2016, CC-1 sent threatening text messages to a woman using the CC-1 Phone Number.

7.  Based on my review of NYPD recordings and records, cellular phone records, and historical cell site records, it appears that there is probable cause to believe that MIGUEL THOMPSON, the defendant, the 911 Caller, and CC-1 conspired to place the Gun under the Car in order to falsely implicate Individual-1. In particular, from my review of these materials, I have learned the following:

a.  NYPD detectives conducted a video interview in which Individual-1 stated, in substance and in part, that he was at an amusement park in New Jersey on June 18, 2016, and that he returned home at approximately 11:00 p.m. that night. NYPD records corroborate Individual-1's statement, showing that a vehicle with the same license plate number as the Car crossed the George Washington Bridge from New Jersey to New York at approximately 10:37 p.m. Based on my own research, it takes approximately 15-20 minutes to travel from the George Washington Bridge to the Location — i.e., where the Car was parked when the Gun was recovered.

b.  The Gun was likely placed under the Car between approximately 11:00 p.m. on June 18, 2016 (when Individual-1 returned from New Jersey) and approximately 8:12 a.m. on June 19, 2016 (when the 911 Call was made). During this period, the CC-1 Phone Number was in consistent contact with both the Thompson Number and the 911 Caller's Other Number. For instance, the following phone calls were made from or to the CC-1 Phone Number:

i.  At approximately 11:26 p.m., the Thompson Number called the CC-1 Number. The call lasted about 103 seconds. Cell site records show that this call was made near 128th Street and Broadway in Manhattan, New York.

ii. At approximately 11:53 p.m., the CC-1 Number called an unknown number. Cell site records show that the CC-1 Number made this call while located in the vicinity of 137th Street and Seventh Avenue in Manhattan, New York, which is where CC-1 lives (the "CC-1 Residence").

iii. At approximately 12:31 a.m., the CC-1 Number called the Thompson Number. Two minutes later, at approximately 12:33 a.m., the Thompson Number called the CC-1 Number. This second call lasted about 86 seconds. Cell site records show that these calls were made and received near the Location — i.e., where the Gun was later recovered. Based on my

own research, the CC-1 Residence is approximately one mile away from the Location.  In my training and experience, I know that there are many Cellular Phone Towers in a densely populated area like Manhattan.  Accordingly, a phone call made from the CC-1 Residence would not likely connect to a Cellular Phone Tower close to the Location.  Instead, such a call would most likely connect to a Cellular Phone Tower close to the CC-1 Residence.  The fact that the call at 12:33 a.m. connected to a Cellular Phone Tower near the Location is therefore consistent with CC-1 leaving his residence sometime after 12:00 a.m., traveling about one mile to the Location, finding the Car parked at the Location, and then calling THOMPSON to inform THOMPSON where the Car was parked.

        iv.    At approximately 12:43 a.m., the CC-1 Number called the 911 Caller's Other Number.  This call lasted about 24 seconds.  Cell site records show that this call was made near 140th Street and 7th Avenue in Manhattan, New York — *i.e.*, between the Location and the CC-1 Residence.  This is consistent with CC-1 calling the 911 Caller while walking home in order to inform the 911 Caller where the Car was parked.

        v.    At approximately 12:57 a.m., the CC-1 Number received a call from an unknown number.  Cell site records show that the CC-1 Number received this call while located in the CC-1 Residence.

        vi.    At approximately 2:17 a.m., the CC-1 Number called the 911 Caller's Other Number.  This call lasted about 46 seconds.  Cell site records show that this call was made from the CC-1 Residence.

        vii.    At approximately 3:59 a.m., the CC-1 Number called the 911 Caller's Other Number.  This call lasted about 124 seconds.  Cell site records show that this call was made from the CC-1 Residence.  This is consistent with CC-1 and the 911 Caller discussing the planting of the Gun under the Car.

        viii.    At approximately 4:41 a.m., the CC-1 Number called the Thompson Number.  This call lasted about 673 seconds (about 11 minutes, 13 seconds).  Cell site records show that this call was made near the Location.  This is consistent with CC-1 leaving his residence sometime after 4:00 a.m., traveling about one mile to the Location, participating in the planting of the Gun under the Car, and then calling Thompson to inform him that the Gun was planted.  Based on my training and experience, individuals engaged in illicit activity often do so very early in the morning, while it is dark outside, and while

few people are out on the street, so as to minimize the chances of detection.

ix. Cell site records show that CC-1 then returned to the CC-1 Residence. Starting again at approximately 7:21 a.m., the following calls were made from the CC-1 Residence:

1. At approximately 7:21 a.m., the CC-1 Number called the 911 Caller's Other Number, but the call lasted only four seconds.

2. At approximately 7:30 a.m., the CC-1 Number called the Thompson Number. This call lasted about 262 seconds (about 4 minutes, 22 seconds). This is consistent with CC-1 informing THOMPSON that CC-1 was trying to contact the 911 Caller.

3. At approximately 7:54 a.m., 8:00 a.m., and 8:01 a.m., the CC-1 Number called the 911 Caller's Other Number three times. The first call lasted about 71 seconds, but the second and third calls lasted only three and four seconds, respectively.

4. At approximately 8:06 a.m., the Thompson Number called the CC-1 Number. This call lasted about 95 seconds. This is consistent with Thompson asking for an update from CC-1.

x. At approximately 8:09 a.m., the CC-1 Number called the 911 Caller's Other Number from the CC-1 Residence. This call lasted about 412 seconds (almost 7 minutes).

1. As stated supra at ¶ 3(a), the 911 Call was made at approximately 8:12 a.m., and lasted about 4 minutes and 20 seconds.

2. Considered together, it appears that, at the time he called 911, the 911 Caller was using two phones simultaneously. On the 911 Caller's Other Number, the 911 Caller was speaking to CC-1 from approximately 8:09 a.m. to approximately 8:16 a.m. Meanwhile, on the 911 Call Number, the 911 Caller was speaking to a 911 Operator from approximately 8:12 a.m. to approximately 8:16 a.m. This is consistent with CC-1 coaching the 911 Caller on one phone, while the 911 Caller spoke to the 911 Operator on the other phone.

       3. The likelihood that CC-1 was coaching the 911 Caller is also consistent with the fact that the 911 Caller frequently paused before providing information during the 911 Call. For instance, at approximately the 41 second mark of the 911 Call, the 911 Caller states "I am trying to get the license plate number for you now." This statement — that he is "trying to get the license plate number" — is inconsistent with the cell site records for the 911 Call Number, which show that the 911 Call was made in the vicinity of 140th Street and Convent Avenue, which is located about 0.7 miles away from the Location where the Car was parked. Then, at approximately the 1 minute, 45 second mark of the 911 Call, the 911 Caller states, "the license plate number is" and pauses for about 9 seconds before he says the first three letters. The 911 Caller then pauses for another 7 seconds before he says the last four numbers. These pauses are consistent with the 911 Caller receiving the license plate number from CC-1 on the 911 Caller's other phone.

      xi. At approximately 8:17 a.m., immediately after the phone call with the 911 Caller ended, the CC-1 Number called the Thompson Number. This call lasted about 38 seconds. This is consistent with CC-1 informing THOMPSON that, as planned, the 911 Caller had falsely reported to the 911 Operator that a person matching the description of Individual-1 had placed the Gun under the Car.

      xii. From approximately 12:57 a.m. to approximately 8:17 a.m., the CC-1 Number made and received about 20 phone calls. All of these calls were made or received from the CC-1 Residence, with the exception of the 4:41 a.m. call to the Thompson Number, which was made close to the Location where the Gun was later recovered.

    c. After the 911 Call and the call to the Thompson Number at approximately 8:17 a.m., the CC-1 Number did not place or answer another phone call until approximately 1:01 p.m. – about five hours later. This is consistent with CC-1 sleeping after having stayed up for most of the night planting the Gun and coordinating the 911 Call.

      i. The first call the CC-1 Number answered after this period was from the Thompson Number. That call lasted about 198 seconds (about 3 minutes, 18 seconds). Before this call, the Thompson number had sent the CC-1 Number a text message at approximately 10:13 a.m., and had left a voice message at approximately 11:34 a.m. The Thompson number also tried calling the CC-1 Number later – at approximately 6:00 p.m., 6:01 p.m., 6:02 p.m., 6:10 p.m., 6:14 p.m., 6:23 p.m.,

7:14 p.m., 7:16 p.m., 7:19 p.m., 7:24 p.m., 7:25 p.m., and 8:05 p.m. All twelve of these calls went to voicemail. The Thompson Number then sent three text messages at approximately 8:16 p.m. The CC-1 Number finally called the Thompson Number back at approximately 8:30 p.m. This call lasted about 474 seconds (almost 8 minutes).

            ii.     Similarly, the 911 Caller's Other Number called the CC-1 Number several times during the afternoon and evening of June 19, 2016 — at approximately 12:09 p.m., 3:22 p.m., 3:51 p.m., 5:44 p.m., and 6:03 p.m. Each time the call went to voicemail. For the call made at approximately 3:51 p.m., the 911 Caller appears to have left a 208-second voicemail message (about three-and-a-half minutes).

            iii.     In my experience, members of a criminal conspiracy often try to speak to one another after completing a crime, in order to provide updates or reassurance.

        8.     To summarize, the cellular phone toll records and cell site records suggest that:

        a.     CC-1 was in consistent contact throughout the early morning hours of June 19, 2016 with both MIGUEL THOMPSON, the defendant, and the 911 Caller.

        b.     CC-1 was in his residence at approximately 11:53 p.m.

        c.     CC-1 left his residence soon thereafter to find the Car.

        d.     CC-1 called THOMPSON from the Location where the Car was parked at approximately 12:31 a.m. (30 minutes later) to inform him that he had found the Car.

        e.     CC-1 was in his residence at approximately 12:57 a.m.

        f.     CC-1 left his residence at approximately 4:00 a.m.

        g.     CC-1 traveled one mile to the Location in order to participate in planting the Gun under the Car.

        h.     CC-1 called THOMPSON from the Location at approximately 4:41 a.m. to inform THOMPSON that the Gun was under the Car.

    i. CC-1 called the 911 Caller several times a few hours later, and reached him at approximately 8:09 a.m.

    j. CC-1 coached the 911 Caller during the 911 Call in order to falsely implicate Individual-1 in the possession of a defaced firearm.

    k. In short, THOMPSON, CC-1, and the 911 Caller appear to have conspired together to have Individual-1 arrested by: (1) placing the Gun under the Car; and (2) having the 911 Caller falsely report to the 911 Operator that he saw a person matching Individual-1's description placing the Gun under the Car.

   9. On or about April 4, 2017, United States Magistrate Judge Andrew J. Peck signed a warrant authorizing investigators to search for and seize the cellular telephone associated with the CC-1 Number ("Phone-1"), and to access certain contents stored within Phone-1. On or about April 5, 2017, Phone-1 was seized and searched. Based on my review of the contents of Phone-1, including its text message history, I have learned the following:

    a. Between on or about June 19, 2016 and June 26, 2016, CC-1 exchanged several text messages with the phone number belonging to MIGUEL THOMPSON, the defendant. I have reviewed the following text messages, among others, in substance and in part:

     i. On or about June 19, 2016, the same day that the 911 Call was made:

| | | |
|---|---|---|
| 6/19/2016 8:20 p.m. | CC-1 | Yo[.] |
| 6/19/2016 8:27 p.m. | THOMPSON | Leg[1] nothing happened[.] |
| 6/19/2016 8:28 p.m. | CC-1 | Wat u mean nothing happened[.] |
| 6/19/2016 8:29 p.m. | THOMPSON | Call me[.] Didn't happen at all bro[.] |
| 6/19/2016 10:53 p.m. – 11:34 p.m. | THOMPSON | Call me[.] Call me hurry up[.] U gotta call me[.] Yo fu k boy call me it's important[.] Yo fool[.] He left when I pulled up[.] I saw him drive |

---

[1] Based on my review of publicly available social media accounts, I have learned that CC-1 sometimes goes by the nickname "Leggo."

| | | off[.]  I was gonna ask u to check it out[.]  But you bullshitn[.] |

Based on my training and experience, as well as the context and content of the messages, I believe that in this exchange, THOMPSON informs CC-1 (a/k/a "Leggo" or "Leg") that Individual-1 was not arrested (e.g., "nothing happened"), even though they called 911 after the Gun was planted under the Car. THOMPSON then tells CC-1 that he saw Individual-1 "drive off," and that he wanted CC-1 to "check it out."

        ii.      On or about June 21, 2016, one day later:

| 6/21/2016 8:12 p.m. – 8:14 p.m. | THOMPSON | Leg u have a bike?  You should ride over there[.]  See if it's out there[.] |
| 6/21/2016 8:14 p.m. | CC-1 | I don't have a bike. |
| 6/21/2016 8:15 p.m. | THOMPSON | We need to know[.]  I know I called again[.]  And I have no clue what's happening[.] |
| 6/21/2016 8:19 p.m. | CC-1 | Neither do i[.] dont have a bike and would would be riding up there again lookin fir a care again[.] I got lucky niggas was outside in a bike that im doin that again[.]  this was a waiste if my time and now I bout beef wit a nigga[.] |
| 6/21/2016 8:24 p.m. – 8:25 p.m. | THOMPSON | Leg[.]  Get it together[.]  It ain't like things aren't possible[.]  You texting too much[.]  I think you should really see if it's even there[.]  Any opportunity we get we need to take[.] |
| 6/21/2016 8:27 p.m. | CC-1 | I dont have a bike im not walkin around[.] its hot im tired[.] |
| 6/21/2016 8:28 p.m. | THOMPSON | We don't have the time for the complaining or anything[.]  If it's over there now we can make another call[.]  Fuck it keep calling till it works[.]  I get it but there has to be another way leg[.]  There has to be a bike or something[.]  there has to be a way.  Let's get it done[.] |
| 6/21/2016 8:33 p.m. | CC-1 | No outside is on a bike that I know its 15 blocks away its hot and not wit it[.] and this on my back[.] wat part u dont get[?] |

| 6/21/2016 8:34 p.m. - 8:35 p.m. | THOMPSON | It's on both of us[.] U forget[.] And I gave 100. And if it don't get done . . . I'm hot[.] |
| 6/21/2016 8:35 p.m. - 8:37 p.m. | CC-1 | Wat[?] I told this he would get the rest of bread the next day[.] niggas carried a loaded u know in the middle the time risked our necks to do that[.] |
| 6/21/2016 8:37 p.m. | THOMPSON | Yo[.] Stop texting all that[.] |
| 6/21/2016 8:37 p.m. | CC-1 | And he aint tryin to here that he did all that for a 100[.] trust me he buggin[.] |
| 6/21/2016 8:38 p.m. | THOMPSON | Let's finish it[.] |
| 6/21/2016 8:39 p.m. - 8:42 p.m. | CC-1 | And I aint see not nothing fir goint to cop and going up riskin my neck[.] U gotta car[.] drive up there in the middle of the nite and see if uts up there[.] just drive thru[.] he[']ll be asleep and he parks blocks from where he lives[.] Or drive to my house and ill drive thru[.] I got a license too[.] But im not walkin up there[.] ive done my part[.] |
| 6/21/2016 9:04 p.m. - 9:06 | THOMPSON | You are texting too much[.] They know the car I'm in[.] So that would not be a good idea[.] You know you are looking at things that are not relevant[.] It's not done[.] When it is then it's good[.] |
| 6/21/2016 9:06 p.m. | CC-1 | They would be . . . [a]sleep by then[.] |
| 6/21/2016 9:06 p.m. | THOMPSON | By when? |
| 6/21/2016 9:08 p.m. | CC-1 | In the middle of nite[.] thats when[.] just know im not going back up there looking for that shit[.] walking at that[.] |
| 6/21/2016 9:09 p.m. | THOMPSON | Take 2 cabs and Bill me[.] if that would work ??? I'll give u 20$ for 2 cabs[.] I just don't think it's smart for me to drive out there[.] |
| 6/21/2016 9:10 p.m. | CC-1 | Stop being fuckin scared[.] |

Based on my training and experience, as well as the context and content of the messages, I believe that in this exchange, THOMPSON is asking CC-1 to go back to the Location to see if the

11

Car is there ("You should ride over there[.]  See if it's out there[.]").  CC-1 refuses, stating that he does not have a bike and that he does not want to walk 15 blocks in the heat.[2]  THOMPSON responds that if the Car is there, "we can make another call" — i.e., call 911 again ("Fuck it keep calling till it works").  After CC-1 refuses again, THOMPSON states that he gave $100, and if the job is not completed, he will be "hot" — i.e., angry.  CC-1 responds that he told the 911 Caller that he would get the rest of his money the next day, and that the 911 Caller does not want to hear that he took the risk of helping to plant a gun and calling 911 for only $100.  CC-1 states that "niggas carried a loaded u know in the middle the time risked our necks to do that" — which I understand to mean that CC-1 and the 911 Caller carried a loaded firearm (the "Gun") and took a big risk.  THOMPSON then tells CC-1 to "stop texting all that."  Based on my training and experience, I know that conspirators often try to limit their discussions of criminal plots over the phone in order to minimize the risk of detection.

THOMPSON then says "let's finish it."  CC-1 refuses to "risk his neck" again, and tells THOMPSON to drive to the Location himself at night to see if the Car is there.  CC-1 notes that Individual-1 will be asleep then, and he "parks blocks from where he lives."  CC-1 reiterates that he will not walk up there, because he's "done [his] part."  THOMPSON again states, "you are texting too much."  THOMPSON also objects to driving up to the Location, because "they know the car I'm in."  This is consistent with the fact that Individual-1 (and Individual-1's girlfriend) both know THOMPSON personally.  THOMPSON then offers to pay for CC-1 to take two cabs — there and back — to see if the Car is at the Location.

       10.  Based on my review of an NYPD Firearms Report, I have learned that the Gun is defaced .380 Caliber Cobra Enterprises Model FS380 pistol, loaded with seven rounds in the magazine.

       11.  Based on my training and experience, and my communications with other law enforcement agents, including a Special Agent from the Bureau of Alcohol, Tobacco, Firearms and Explosives who is familiar with the manufacturing of firearms, I have learned that the Gun was not manufactured in New York State.

---

   [2] As stated supra ¶ 7(b), CC-1 lives in the vicinity of 137th Street and Seventh Avenue, which is approximately 15 blocks away from where the Car was parked and the Gun recovered.

12. Based on my review of criminal history records pertaining to MIGUEL THOMPSON, the defendant, I have learned that on or about February 13, 2007, in New York County Supreme Court, THOMPSON was convicted of assault in the second degree, in violation of New York Penal Law § 120.05, a felony, which is punishable by imprisonment for more than one year.

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of MIGUEL THOMPSON, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

_____
ANTOINETTE GUZMAN
Criminal Investigator
United States Attorney's Office
Southern District of New York

Sworn to before me this
April 14, 2017

_____
THE HONORABLE ANDREW J. PECK
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK